RECEIVED
MAR 22 2024
RICHARD W. NAGEL, CLERK OF COURT
COLUMBUS, OHIO

IN THE UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO

| | |
|---|---|
| UNITED STATES OF AMERICA *ex rel.* KARA N. MOATS & DONALD MOATS<br><br>and<br><br>KARA N. MOATS<br><br>and<br><br>DONALD MOATS<br><br>Plaintiffs,<br><br>v.<br><br>KANOY HOLDINGS, LLC<br><br>and<br><br>MICHAEL A. YONAK, JR.<br><br>and<br><br>SARA J. YONAK<br><br>Defendants. | FILED UNDER SEAL PURSUANT TO<br>31 U.S.C. § 370(b)(2)<br><br>CASE NO. 2:24 CV 1316<br><br>Judge<br>Magistrate Judge  JUDGE GRAHAM<br>MAGISTRATE JUDGE JOLSON |

**COMPLAINT**

Plaintiffs Kara N. Moats and Donald Moats state their Complaint:

**INTRODUCTION**

This action is brought under the False Claims Act, 31 U.S.C. § 3729 *et seq. Qui tam.* Plaintiff Kara N. Moats ("Mrs. Moats") and Plaintiff Donald Moats ("Mr. Moats") (collectively "Plaintiffs") rented a house located at 47680 Moore Ridge Rd, Woodsfield, OH 43793 (the

1

"Premises") pursuant to a federally-regulated rent subsidy program known as the Section 8 Tenant Based Housing Choice Voucher Program ("Section 8 Program"), administered locally by the Cambridge Metropolitan Housing Authority ("CMHA"). Defendant Kanoy Holdings, LLC ("Kanoy Holdings") owns the Premises and has owned the Premises since June 2017;, Defendant Michael A. Yonak Jr. ("Defendant M. Yonak") has at all times served as the landlord for the Premises, and Defendant M. Yonak and Defendant Sara J. Yonak ("Defendant S. Yonak") (collectively "Defendants") owned the subject Premises from February 2005 to June 2017.

Landlords that rent under the Section 8 program are required to submit the proposed lease with the rent amount. Based upon the lease, the landlord and CMHA enter into a Housing Assistance Payment Contract ("HAP"), which states that tenants are to be charged a specified rent amount. Defendant violated the law by charging Plaintiff more in rent than was listed in the HAP and approved by CMHA.

The United States seeks all remedies available under the False Claims Act. Plaintiff seeks a statutory share of any awarded damages paid to the United States under the False Claims Act, in addition to costs, reasonable attorney fees, and damages as set forth herein as a result of the egregious behavior of the Defendants, both individually and collectively, during the Plaintiffs' tenancy.

**PARTIES**

1. Plaintiffs, Kara Moats and Donald Moats, were tenants of Defendant(s) at a house located at 47680 Moore Ridge Rd, Woodsfield, OH 43793 from June 2009 to June 2023.
2. Plaintiff United States of America is *ex rel.* Kara and Donald Moats.

3. Defendant Kanoy Holdings, LLC is an Ohio limited liability company with a tax mailing address of 229 Oaklawn Ave, Woodsfield, OH 43793-1056. Kanoy Holdings, LLC has owned the subject Premises June 2017

4. Defendant Michael A. Yonak Jr. is a private citizen who has at all times acted as the landlord at the Premises where Plaintiff rented. Defendant M. Yonak is married to Defendant S. Yonak.

5. Defendant Sara J. Yonak owned the subject Premises with her then husband, Defendant M. Yonak, from February 2005 to June 2017.

## JURISDICTION

6. This Court has jurisdiction over Plaintiffs' federal claim pursuant to 28 U.S.C. § 1331, 1345, and 1367 and 31 U.S.C. § 3732.

7. This Court has supplemental jurisdiction over Plaintiffs' Ohio state law claims pursuant to 28 U.S.C. §1367 and 31 U.S.C. § 3732.

## VENUE

8. Venue is proper under 28 U.S.C. § 1391(b)(1) because all Defendants are residents of Monroe County, Ohio, the State in which this Court's district is located.

9. Venue is proper under 28 U.S.C. § 1391 because Defendants committed the unlawful acts in Monroe County, Ohio.

10. Venue is also proper under 31 U.S.C.S. § 3732(a) because Defendant Michael A. Yonak Jr. can be found, resides, transacts business, and committed the unlawful acts at issue in this judicial district and division.

## STATEMENT OF FACTS

11. The federal government instituted the Section 8 Program to assist low-income families with obtaining decent, safe, sanitary, and affordable housing; it is authorized by Section 8 of the

U.S. Housing Act of 1937, 42 U.S.C. §1437(f), and governed by regulations contained in 24 C.F.R. Part 982.

12. Under the Section 8 Program, the United States Department of Housing and Urban Development ("HUD") enters into annual contribution contracts with public housing agencies ("PHA"), including CMHA.

13. Under the annual contribution contract, CMHA enters into a contract with the landlord of an existing dwelling to make monthly housing assistance payments on behalf of eligible tenants, subject to HUD approval; this contract is known as a Housing Assistance Payments Contract ("HAP").

14. The HAP establishes the monthly rental amount. CMHA pays any subsidy to which the landlord is entitled directly to the landlord.

15. The HAP may also provide that, based on the tenant's ability to pay, the tenant pays a portion of the rent in addition to the payments made by CMHA.

16. Generally, Section 8 participants pay 30% to 40% of their adjusted monthly income for rent, while CMHA pays the remaining balance directly to the landlord.

17. In addition to the HAP, the landlord simultaneously enters into a lease agreement with the eligible family that must comply with federal regulations. The HAP establishes the initial lease term and initial monthly rent to the landlord which cannot be increased without a redetermination by CMHA.

18. Every year, participants in the Section 8 Program must undergo recertification by CMHA.

19. At all times mentioned hereafter, the Plaintiffs received housing assistance from CMHA under the Section 8 Program. The Plaintiffs occupied the Premises continuously from June 2009 until June 26, 2023.

20. In, 2009, the Plaintiffs signed a lease offering to rent the Premises to Plaintiffs at Six Hundred Dollars ($600.00) per month.

21. On or about the same time, Plaintiffs and Defendant(s) submitted a Request for Tenancy Approval, form HUD-52517, to CMHA.

22. Subsequently, CMHA approved the subject Premises for rental under the Section 8 program, with monthly approved rent of Four Hundred Sixty Dollars ($460.00). The documents executed by Defendant(s) clearly state that the approved monthly rental amount was $460.00, $140 less than the lease offered by the Defendant(s) to Plaintiffs referenced in Paragraph 20.

23. Throughout the Plaintiffs' participation in the Section 8 Program, CMHA had an annual contribution contract with HUD; under this contract, HUD provided money to CMHA to pay for housing assistance to Defendant(s) on behalf of the Plaintiffs.

24. The original HAP Contract provided that the total monthly rent for the Premises was $460.00. The Plaintiffs' portion of the rent was $156.00, and HUD's portion was $304.00. However, once the Section 8 voucher was approved, Defendant M. Yonak claimed that the total rent was $600.00, and the Plaintiffs had to increase their rent payment to Defendant(s) to $296.00, all while Defendant(s) was collecting $304.00 from HUD monthly. This amount is $140.00 more than the amount allowed by the HAP.

25. Throughout the Plaintiffs' tenancy, the Defendant(s) demanded payment in excess of the Plaintiffs' HUD-approved rental portion on a monthly basis to pay the difference between the HUD-approved rental amount of $460.00 agreed upon by the Defendants and the $600.00 the Defendants insisted the Plaintiffs pay to avoid eviction from the Premises and potentially subsequent loss of eligibility in the Section 8 program.

26. The Plaintiffs had to continue to pay $296.00, $140.00 more than was approved by CMHA, to Defendants each month from around August 2009 until the Summer of 2022.

27. In the Summer of 2022, Defendant(s)increased their total monthly rent to $700. Plaintiffs were then forced to pay $396.00, $240.00 more than their rental obligation, for rent until April 3, 2023.

28. In April 2023, Plaintiffs dropped off payment of $156.00 for their portion of rent to Defendant's mailbox, as was the established payment method, along with a note that stated Plaintiffs would only pay the rent established in the HAP Contract from then on.

29. On or about April 4, 2023, Defendant M. Yonak operated a backhoe on or near the Premises and intentionally destroyed the gas line which led to the Premises. Because of this, Plaintiffs did not have access to hot water, the furnace, or the stove from April 4th until Plaintiffs vacated the Premises on June 26, 2023.

30. Plaintiffs received gas service through their own account with Dominion East Ohio, and Plaintiffs are enrolled in the PIPP Program. Representatives from Dominion were called to the Premises several times to make repairs; however, due to lack of cooperation by Mr. Yonak and aggression displayed toward them by Mr. Yonak, agents of Dominion were unable to restore gas service to the Premises after April 4, 2023.

31. Plaintiffs receive internet service through their own account provided by AT&T. The internet equipment, which provided internet connection to the Premises for Plaintiffs and family members, is located on Defendant's property.

32. Sometime in April 2023, Defendant M. Yonak intentionally destroyed the internet equipment. AT&T, the internet company, attempted to enter Defendant's property to repair the internet

equipment, but Defendant M. Yonak, again, displayed aggression and was uncooperative in permitting repairs to the equipment by AT&T.

33. On June 9, 2023, Defendant M. Yonak taped a sheet of notebook paper on the front door of the Premises which read: "3 DAY NOTICE TO LEAVE THE Premises Due to breach of contract. IE: NON PAYMENT OF rent 5-1-23 + 6-1-23 + TO [sic] MANY VEHICLES." and what appears to be a signature at the bottom.

34. On multiple occasions, Defendant M. Yonak has entered the Premises for non-emergency matters without prior proper notice.

    a. Sometime in April 2013, Defendant M. Yonak knocked on the front door of the Premises during the afternoon. Defendant M. Yonak was holding a pistol and sat down in the Plaintiffs' living room and laid the pistol on the coffee table. Defendant M. Yonak stayed at the table for a period of time and complained about issues in his personal life.

    b. When Defendant M. Yonak was having an argument with his wife, Defendant S. Yonak, he would often come to the subject Premises visibly intoxicated after midnight in the early hours of the morning.

    c. Defendant M. Yonak would ride his farm equipment around the Premises visibly intoxicated and has previously ran into the Premises with farm equipment.

35. As part of the Section 8 Program, the Premises was subject to annual inspections by CMHA.

36. Copies of the results of the inspections, which would identify "Landlord Obligations" for repairs, were provided to the Defendants and Plaintiffs by CMHA.

37. In response to these letters received by Defendants, Defendant M. Yonak wrote letters to the Plaintiffs which stated that he refused to make any repairs to the Premises. Defendant M.

Yonak stated in these letters that if he had to make repairs to the Premises, he would increase the Plaintiffs rent accordingly. Defendant M. Yonak stated that the Plaintiffs would be obligated to make all repairs to the Premises.

38. For a period of three years, and unbeknownst to the Plaintiffs, the water supplied to the Premises was from a nearby, untreated pond. Defendant lied to Plaintiff and told Plaintiff that a well was the source of water. The pond water caused damage to the dishwasher, washing machine, and Plaintiffs. Plaintiffs had to change the water source to a well that was on the Premises.

39. To access the water in the well, the Plaintiffs had to replace the water heater on the Premises due to damage caused by the pond water, which cost the Plaintiffs approximately $600.00 out-of-pocket. The Plaintiffs had to pay out-of-pocket to replace two well pumps on the Premises, each costing approximately $750.00.

40. During the Plaintiffs' occupancy, the roof of the Premises was leaking. The Plaintiffs paid to fix the roof out-of-pocket because the Defendants refused to make repairs.

41. During the Plaintiffs' occupancy, the plumbing in the basement of the Premises was damaged through no fault of the Plaintiffs and caused raw sewage to leak out. The Plaintiffs paid to fix the sewage leak out-of-pocket because the Defendants refused to make repairs.

42. Upon information and belief, Defendant M. Yonak intentionally sprayed weed-killing chemicals on the Plaintiffs' garden, killing the tomato, cucumber, and strawberry plants.

43. On many occasions Defendant M. Yonak made sexually explicit comments to Mrs. Moats and Mrs. Moats' stepdaughter. On one occasion, Defendant M. Yonak grabbed hold of Mrs. Moats in her kitchen, and she had to push off her.

44. On June 17, 2023, the Plaintiffs moved out of the Premises but left some personal property that they planned on retrieving later and still retained keys to the Premises.

45. On June 26, 2023, the Plaintiffs returned to the Premises to retrieve the remaining personal property and discovered that the doors to the Premises were nailed shut with railroad spikes. Plaintiffs were unable to enter the Premises to retrieve the remaining personal property, which still remains in the Premises but, as a result, has been abandoned by the Plaintiffs.

46. On June 26, 2023, while at the Premises, Mr. Moats ran over what appear to be intentionally laid metal spikes placed in the yard and driveway of the premises. These metal spikes were not open and obvious, and caused damages to Mr. Moats' vehicle tires.

47. The Plaintiffs mailed Defendant the keys to the Premises on or about June 26, 2023 and notified the Defendants in writing that they had officially moved out as of June 26, 2023.

## COUNT ONE

*Violation of the False Claims Act*

48. The Plaintiffs incorporate the allegations set forth in paragraphs one (1) through fifty (50) as though plead here in full.

49. The False Claims Act (the "FCA"), 31 U.S.C. § 3729, imposes liability on any person who "knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim." 31 U.S.C. § 3729(a)(1)(B). Such a person could be liable to the United States for not less than $5,000 and not more than $10,000, plus three times the damages suffered by the United States as a result of such a person's actions. *See* 31 U.S.C. § 3729(a)(1)(G).

50. The FCA defines "knowingly" to mean that a person, with respect to information, has actual knowledge of the information, acts in deliberate ignorance of the truth or falsity of the

information, or acts in disregard of the truth or falsity of the information. 31 U.S.C. § 3729(b)(1). "Knowingly" does not require proof of specific intent to defraud. 31 U.S.C. § 3729(b)(1)(B).

51. The FCA defines "claim" as "any request or demand" for money made to a recipient if the United States, "provides or has provided any portion of the money or property requested or demanded," to advance a Government program or interest." 31 U.S.C. § 3729(b)(2)(.

52. Defendant(s) agreed in Part C of the HAP, paragraph 5, that "[t]he owner may not charge or accept, from the family [. . .] any payment for rent of the unit in addition to the rent to owner. Rent to owner includes all housing services, maintenance, utilities, and appliances to be provided and paid by the owner in accordance with the lease." Furthermore, "[t]he owner must immediately return any excess rent payment to the tenant." [1]

53. Defendant(s) further agreed in Part C of the HAP, paragraph 18, that "[t]he owner must notify the PHA of any changes in the amount of the rent to owner at least sixty days before any such changes go into effect, and the amount of the rent to owner following any such agreed change may not exceed the reasonable rent for the unit as most recently determined or redetermined by the PHA in accordance with HUD requirements."

54. Defendant(s) knowingly made or used, or caused to be made or used, false records or statements to get false or fraudulent claims paid or approved by officials of the United States Government in violation of the FCA.

55. The Defendants' endorsement and presentation for payment of each monthly housing assistance payment check, while knowingly imposing a higher rent amount and requiring

---

[1]HAP Contract, Part C, Paragraph 4 defines "rent to owner" and states *inter alia,* that "[d]uring the term of the lease [including the initial term and any extension thereof], the rent may at no time exceed: (1) the reasonable rent for the unit as most recently determined or redetermined by the PHA in accordance with HUD requirements [. . .]."

Plaintiffs to pay an extra rent in the amount of at least $140.00 each month, constitutes a false claim or representation against the United States.

56. The Defendants knowingly, with deliberate indifference, or reckless disregard misrepresented the amount of rent the Defendants were collecting from Plaintiff, whose rent was being subsidized by CMHA under the Section 8 Program, causing the Government to make unwarranted payments to the Defendants.

57. Upon information and belief, the Defendants endorsed and presented for payment one hundred fifty-two housing assistance payment checks from September 2009 to May 2022 while intentionally and knowingly forcing the Plaintiffs to pay an additional $140.00 each month in violation of the contract that Defendants signed..

58. Upon information and belief, the Defendants endorsed and presented for payment nine housing assistance payment checks from June 2022 to March 2023 while knowingly increasing the rent the Plaintiffs had to pay directly to the Defendants by $240.00 each month.

59. The United States of America suffered damages as a result of violations of the False Claims Act because the housing assistance payment money with HUD disbursed to CMHA for payment to the Defendants under the Section 8 Program on behalf of Plaintiff would not have been paid to the Defendants absent Defendants' false claims and misrepresentations.

60. The United States sustained damages equal to all payments made to Defendant(s) pursuant to Plaintiffs' Section 8 assistance.

61. The United States sustained damages equal to triple the excess rent amount paid by the tenant. *U.S. ex rel. Wade v. DBS Investments, LLC*, 2012 WL 3759015.

**COUNT TWO**
*Violation of Ohio Landlord-Tenant Act*

11

62. The Plaintiffs incorporate the allegations set forth in the preceding paragraphs as though plead here in full.

63. As landlord(s), Defendant(s) is/are obligated to comply with all provisions of the Ohio Landlord-Tenant Act set forth at Ohio Revised Code §5321.01, *et seq*.

64. As set forth in R.C. §5321.04, as part of his/their obligations as a landlord, the Defendant(s) are obligated to, *inter alia*:

    a. Make all repairs and do whatever is reasonable necessary to put and keep the premises in a fit and habitable condition;
    b. Maintain in good and safe working order and condition all electrical, plumbing, sanitary, heating, ventilating, and air conditioning fixtures and appliances, and elevators, supplied or required to be supplied by the landlord;
    c. Supply running water, reasonable amounts of hot water, and reasonable heat at all times
    d. Not abuse the right of access conferred by division (B) of section 5321.05 of the Revised Code; and
    e. Provide reasonable notice of his/their intent to enter the Premises and enter the Premises only at reasonable times.

65. Plaintiffs provided reasonable notice to the Defendant(s) to make repairs to the home and/or the Defendant(s) were provided reasonable notice of needed repairs to the home by CMHA.

66. Defendant(s) has/have failed and refused to make any repairs to the Premises whatsoever.

67. Defendant(s) has/have breached their/his duties under R.C. 5321.04 by:

    a. Providing the Plaintiffs with non-potable pond water as the water source for the Premises;
    b. Failing to make any repairs whatsoever to the subject Premises after Plaintiffs timely requested said repairs be made. The failure to make repairs include, but are not limited to:
        i. Destruction and failure to repair the gas line to the Premises;
        ii. Failure to repair the water heater;
        iii. Failure to repair pumps in the well;
        iv. Destruction and failure to allow repairs to the internet equipment;
        v. Failure to repair or replace the dishwasher
    c. Abusing the right of access conferred upon a landlord by division (B) of Section 5321.05 by failing to ever provide a permissible basis to access the subject Premises during the Plaintiffs' occupancy;

    d. And entering the Premises without first providing reasonable notice in non-emergency situations.

68. As a result of the Defendant(s) failure to comply with his/their obligations under Ohio law, the Plaintiffs have suffered damages in an amount not yet determined resulting from out-of-pocket money to make repairs the Defendant(s) is/are obligated to make, and due to lack of potable water and gas service to the home.

## COUNT THREE
*Breach of Implied Covenant of Quiet Enjoyment*

69. The Plaintiffs incorporate the allegations set forth in the preceding paragraphs as though plead here in full.

70. At Ohio common law, a residential landlord is required to maintain the rented property in compliance with the common law implied covenant of quiet enjoyment.

71. Defendant(s) substantially interfered with Plaintiffs' quiet enjoyment of the Premises as set forth herein by, *inter alia,* destroying the gas line supplying gas to the Premise and refusing access to have it repaired, destroying the internet equipment and refusing access to have it repaired, spraying harmful chemicals, supplying the Plaintiffs with non-potable pond water, making sexual comments toward Mrs. Moats and her stepdaughter, nailing the door to the Premises shut with railroad spikes, entering the property at all times of day, and bringing firearms onto the property.

72. The Plaintiffs suffered damages as the result of Defendants continued and consistent interference with the Plaintiffs' quiet enjoyment of the Premises.

## PRAYER FOR RELIEF

    WHEREFORE, the Plaintiffs and the United States of America respectfully request the following relief:

13

A. Find that Defendant(s) violated the False Claims Act and is liable to the United States.

B. Assess a civil penalty against Defendant(s) for each separate violation of the False Claims Act in the amount of not less than $5,500.00 and not more than $11,000.00, for a total of not less than $885,500.00 (TRIPLE THE AMOUNT OF EXCESS RENT ) + ($5,500 FOR SINGLE ACT OF VIOLATING HAP CONTRACT TO NOT CHARGE EXCESS RENT) and not more than $1,771,000.00 (TRIPLE THE AMOUNT OF EXCESS RENT) + ($11,000 X # OF MONTHS DEF. VIOLATED FCA).

C. Award the United States three times the amount of damages that it sustained as a result of Defendants' acts.

D. Award the Plaintiffs the *qui tam* plaintiff's share of the proceeds or settlement pursuant to 31 U.S.C. § 3730(d).

E. Award the Plaintiffs damages in the amount to be proven at trial for Defendants' violations of the Ohio Landlord-Tenant Act.

F. Award the Plaintiffs compensatory damages for bearing the cost of repairs to the Premises.

G. Award the Plaintiffs damages for the lack of gas and internet due to Defendant(s)' refusal to repair each.

H. Award the Plaintiffs damages for Defendant(s)' breach of the implied covenant of quiet enjoyment of the Premises.

I. Award the Plaintiffs costs and reasonable attorneys' fees under applicable Federal and State Law.

J. Grant other relief deemed just and proper.

15

Respectfully submitted,

*Kristin Dour* for Peggy Lee (#0074392)
Peggy Lee (0067912)
Legal Aid of Southeast and Central Ohio
964 East State Street
Athens, Ohio 45701
740.594.3558, telephone
plee@lasco.org